Good afternoon. May it please the Court. My name is Erwin Chemerinsky. On behalf of the Defendant Appellant Stephen Yagman, there are three separate reasons why the convictions in this case should be overturned. What's striking is that in each of them, there's a Ninth Circuit case directly on point that requires reversal. I'd like to first begin, because I think it's most straightforward, with the argument that due process was violated because defense witnesses who denied immunity would have directly contradicted the testimony of a prosecutorial witness who was granted immunity. Here, the relevant case is United States v. Straub from August of 2008. There, the Court held that it violates due process if the denial of immunity to a defense witness has the effect of distorting the fact-finding. Specifically, Straub said that it violates due process if immunity is given to a prosecutorial witness and then denied to a defense witness, which contradicts the prosecutorial witness' testimony. There's really three questions here for this Court under Straub. First, was immunity granted to a prosecutorial witness? And the answer is clearly yes, and that Ernst Widmar was given immunity. Second, was immunity denied to defense witnesses? And again, the witnesses immunity was requested for, they were both named as unindicted co-schemers in the indictment. And this is Marion Yagman, his ex-wife and longtime law partner, and Katie Maddox, his longtime living companion. And that leads to the third and final question, would testimony of either of these witnesses contradicted Mr. Widmar's testimony? And this is most clear with regard to Ms. Yagman. In fact, if you look at page 27 of the government's brief, they describe for you what Ms. Yagman would have testified to. Her testimony would have directly contradicted the fraud inference from Mr. Widmar's testimony. What Mr. Widmar said was that in November of 1999, he was instructed by Mr. Yagman not to wire money, but to send a cashier's check. This was a garlic-lello check. And that that check was not posited until June after Mr. Yagman filed for bankruptcy. The government was using Mr. Widmar's testimony to say that this shows that Mr. Yagman was involved in bankruptcy fraud. What Ms. Yagman would testify to is that what was done here was the customary business practice in the office. It would have directly contradicted any inference of fraud from Mr. Widmar's testimony. The other witness from whom immunity was requested was Ms. Maddox. Well, now, wouldn't you say would have contradicted the inference of fraud? As far as I could see, it would not have contradicted the testimony, but it would have provided evidence from which Mr. Yagman's attorney could have argued this was in the ordinary course of business or something. Yes, Your Honor. That's exactly what happened in Straub. In Straub, if you recall, the prosecutor had introduced testimony that Mr. Straub was responsible for a murder. What the defense wanted to introduce was the testimony of Baumann that he had heard somebody else come into the bar and say, I had killed someone. Now, it's not that Adam's testimony or what Mr. Baumann's report that Mr. Adams said would have directly responded to the witness against Straub. It would have budded the inference that a murder occurred. And so in that way, I think Straub is directly on point to this case. Most of all, Your Honor, I think that what Straub says is that if the denial of immunity to a defense witness distorts the fact-finding process, then there's a denial of due process. Straub says you focus on the effect. And it's our argument both is the denial of immunity to Ms. Yagman and the denial of immunity to Ms. Maddox that the effect of distorting the fact-finding process. Wouldn't that happen, though, any time? I'm trying to struggle with this idea of the difference between a direct contradiction and testimony that could lead to a contradictory inference. And it seems to me those are two different things. And one is a much broader rule than the other. Well, Your Honor, here, though, as I was saying to Judge Thomson, I think you have to go to the underlying standard. Would it have the effect of distorting the fact-finding process? There's another passage in Straub that I direct, Your Honor, to in response to your question. It's at 537 F. 3rd at 1163. And I'm quoting, I think the fact that the Court's saying it's enough that it be a brick, and that's what we're arguing here, the testimony of Yagman and Maddox were bricks that were key to respond to the inference that was drawn from the student court. Well, where's the line, though? That's what I'm struggling with. I see the point there.  But is it enough to raise a reasonable doubt? Is it enough to overcome it? I mean, when you say, what's the gloss we should put on undermine? I think the line here, I'm quoting page 1162 of Straub, is does it have the effect of distorting the fact-finding process? And here I think it would, because Mr. Widmer's testimony was just entirely to suggest that Mr. Yagman had committed fraud with regard to the handling of the Cololo check. Especially Ms. Yagman's testimony showed that there was no fraud committed there. And so that's why I believe, in terms of the line, it's a distortion of the fact-finding process. The second separate ground for reversal of the convictions is that there was not a basis for bankruptcy fraud under 18 United States Code, Section 157, because that requires a And here, Your Honors, the key case is United States v. Millway, which I would suggest is directly on point. And again, the language could not be clearer. Here I'm quoting to you from 475 of 3rd of 1155. The focus of Section 157 is a fraudulent scheme outside the bankruptcy which uses the bankruptcy as a means of executing or concealing the artifice. If you look at count two of the indictment, and you find count two in volume two of our excerpt of records at page 234, you'll notice that count two is all about how Mr. Yagman concealed assets with regard to the bankruptcy. Millowit clearly says that more than that is required. Millowit says it has to be the use of a bankruptcy to further another fraudulent scheme. I'll read you one more passage from Millowit. And this is page 1160 where Millowit says bankruptcy fraud under Section 157 cannot be predicated only on acts that occur within the bankruptcy context that are untethered to an underlying fraudulent scheme. Well, I thought there was other evidence that he was attempting to avoid taxes, evidence tending to prove that he attempted to evade taxes. Well, Your Honor, here... Oh, pardon me. No, I'm sorry. Well, I thought there was evidence he was trying to evade taxes, he was trying to diminish the ability of creditors to get to his assets through the use of Ms. Maddox's bank accounts and the money he was putting in there, and the way the income from the law practice was to defraud creditors and to evade taxes, and eventually he filed a petition in bankruptcy. Now, isn't that evidence of this fraud apart from the bankruptcy? No, Your Honor. I think it's very important to separate trying to conceal assets from creditors, that's just what's going on in the bankruptcy proceeding itself, and that's not unfamiliar, from whether or not he was trying to further a fraudulent scheme. This goes to count one of the indictment, and here, Your Honor, it's very important to separate two different things that were alleged in count one of the indictment. One is that Mr. Yagman didn't pay taxes that he owed. That's not fraud. That's just not paying taxes that you owe. The other is that he was concealing assets with regard to tax liability. The bankruptcy petition only related to the former of those, the taxes that he owed that he didn't pay. The bankruptcy was never alleged to have anything to do with the concealment of assets. What Mr. Yagman was trying to do with the bankruptcy according to the indictment was he was trying to use the bankruptcy to discharge the tax liability for the taxes that he didn't owe. That's not a fraudulent scheme, Your Honor. Another way to look at this is why if this indictment doesn't stand, this conviction doesn't stand, why it then takes out the money laundering convictions, because all of the briefs, according to the government's brief, went to section 152 for concealment of assets. However, United States v. Santos makes clear that concealment of assets isn't sufficient by itself for a money laundering conviction. Here, too, I refer you to the specific language of the case, which, what's more, couldn't be clearer from one point. In Santos, at 128 Supreme Court, pages 1028-29, the severe money laundering penalties will be imposed only for the removal of profits from criminal activity, which meant the leveraging of one criminal activity into the next. And, Your Honor, there's no allegation that that was going on here. So even if there was concealment from creditors, that's not enough for 157, and that's not enough for the money laundering convictions, which then based upon the concealment from the bankruptcy proceedings. The third and final grounds for reversal of the convictions is that due process was violated because Mr. Yadner was not able to present his defense with regard that he was framed. Here, I think that the key case is United States v. Sager, where this Court had said that the district court had erred by prohibiting and preventing the defendant from fully inquiring into the prosecutor's methods. I think here the way the government frames the issue in its brief is very helpful. The government says with regard to framing, there's always three questions, who, why, and how. And I think if you go through each of the witnesses that the defense wanted to have testify, each piece of their testimony goes to who, why, and how. Now, the government's key argument in its brief is that all of this goes to vindictive prosecution. But, of course, the same evidence could go to both vindictive prosecution and as to a framing defense. And the key here is that the judge violated due process by keeping the defendant from And so if you look at the specific witnesses, for example, Special Agent Mullally, there was the desire to ask him questions about whether there was deliberate suppression of evidence and concealment of evidence, which goes to the how the framing might have been done. There was the desire to call Jeffrey Isaacs as a witness, to show that he threatened Mr. Yadner, that he concealed documents, that he pressured Pallello to testify. All of this, again, going to the who, the how, and the why with regard to the framing defense. And in this sense, the Sager case is directly relevant because there they said keeping the defendant from inquiring into prosecutorial methods for framing defense violated due process. The United States v. Washington is clear that preventing a defendant from preventing a defense is a violation of due process. If there aren't other questions, I'll save them any time for rebuttal. Thank you. Good afternoon, and may it please the Court. Byung Soo Kim for the United States. With the Court's permission, I would like to address the issues involving the vindictive prosecution defense as well as the compelled immunity issue. My co-counsel, Alka Sager, who is also with me trial counsel in this case, will be So now what is it you're going to be arguing? I'll be addressing, Your Honor, the vindictive prosecution issue as well as the compelled immunity issue, which is the first. The what issue? The compelled immunity issue. Okay. That was first raised by Appellant's counsel. Starting with that issue, Your Honor, Straub is the controlling case on this issue, and what the Straub case holds very clearly is that there does, in fact, have to be a direct contradiction in the testimony between the government witness who has been immunized and the prospective defense witnesses. A contradiction in inference is simply not enough, and that's borne out by the facts of Straub itself. In that case, the direct contradiction was between a government immunized witness who, when asked, did you say to the defense witness who was not immunized, did you tell that defense witness, I just shot the victim in the case, he said no. And that's precisely what the defense witness, who was not immunized and who did not testify, would have testified to. In other words, there was a direct contradiction between two witnesses, one of whom said, I shot the victim, not the defendant, and the other witness who would have said on behalf of the defense that that's precisely what this government immunized witness told me. So the contradiction has to be direct, and that standard has not been satisfied in this case and cannot be satisfied because Ernst Wittmer spoke about what he did in response to a call from Michael Colello's wife. Mr. Colello was a former client of Mr. Wittmer. Mr. Wittmer resided in Switzerland. Mr. Colello's wife calls Mr. Colello and asks Mr. Colello if she sends to Mr. Jagman $125,000. Mr. Wittmer then gets on the phone with Mr. Jagman to confirm this, and Mr. Jagman says, yes, I'd like you to send me $125,000. This is in connection with a criminal case in which I will be representing Mr. Colello in the United States, and I'd like you to send it to me via cashier's check, not through wiring. Mr. Wittmer then sends the $125,000 cashier's check from Switzerland to the United States and then confirms with Mr. Jagman that he's received the check. Ms. Jagman would not have contradicted any portion of that testimony. She could not have possibly contradicted any portion of Mr. Wittmer's testimony because she wasn't a party to any of those conversations that Mr. Jagman and Mr. Wittmer had. She was not in Switzerland. She didn't have anything to do with how the check or money was going to be sent to the United States. All that Ms. Jagman would have testified about, according to the proffer of her testimony that was provided by the defense counsel at trial, was that once the check arrived at the Jagman law offices, Mr. Jagman gave the check to her for her to keep in a safe place, and she then did so. Mr. Jagman then filed for personal bankruptcy in New York, did not declare or reveal the existence of the $125,000, and then only later, after receiving a retainer agreement, caused the check to be deposited. In other words, the testimony of Mr. Wittmer was entirely consistent with that of Ms. Jagman. Your Honor, even if there were a direct contradiction in this case, there would still have been no distortion of the fact-finding process so as to deny Mr. Jagman his right to a fair trial under the due process clause, and that's because even had Ms. Jagman testified, her testimony would have been entirely consistent with the government's theory of the case with respect to the $125,000 cashier's check. In closing argument, the government didn't attempt to dispute what Ms. Jagman would have testified to about the check and what Mr. Jagman did testify to about the $125,000 check. The government's argument in closing was that it was irrelevant who had the check and whether or not it belonged to Mr. Jagman before or after the receipt of this retainer agreement from Mr. Cololo. And it was irrelevant, the government argued, because the bankruptcy petition required Mr. Jagman to list not only property belonging to him, but also any property in which he had a contingent interest, any property in which he had an equitable interest, and any property belonging to someone else, such as Mr. Cololo, under his own theory, that he was holding or controlled. And so, therefore, regardless of what Ms. Jagman might have testified about, the government would have argued, and did argue, that there was ample basis for finding the defendant guilty based on this $125,000 check. If I might turn now to the last issue addressed by Pauline's counsel relating to the vindictive prosecution evidence. Why would the government be reluctant to allow Ms. Jagman to testify and to give her immunity, give her use immunity? Well, Your Honor, the record doesn't speak to that issue directly, but I think the record does suggest a couple answers. And I was trial counsel and can speak to that issue based on what the record before the court says. And I think there are at least two reasons. First, Your Honor, if the government had believed that not immunizing Mrs. Jagman would somehow have distorted the fact-finding process, then I think that the government's answer, when asked by the district court whether we would agree to immunize Mrs. Jagman, would have been different. But the government didn't believe that there would be any distortion of the fact-finding process, because based on the proffer of her testimony that was provided by trial counsel for Mr. Jagman, there was going to be no contradiction between her testimony of that of Mr. Vidmer and certainly no distortion of the fact-finding process. The second reason, Your Honor. Why is it up to the government to make this decision? Well, Your Honor, I think that that goes to the important separation of powers concerns that are discussed in the Straub opinion itself. In that opinion, this Court spent a great deal of time discussing the important separation of powers concerns that are involved in any kind of decision to compel immunity because it is the executive branch's decision, under separation of powers theory, to decide whether to prosecute to someone and when that person should be immunized. And, of course, it's the government that typically has the best access to the facts of what this person might, in fact, have done. And so I think there are good reasons why that important responsibility is. It sounds like the kind of argument we've heard in the last year. Well, I'm not sure exactly what the... It came out of the Justice Department. Well, I'm not sure exactly what you're referring to, Judge Pegersen. But I think that there's no doubt simply based on the language in the Straub case itself that the decision to immunize a witness does implicate separation of powers issues. And so that's one of a few reasons why the government, I believe, made the decision that it did. The second reason, Your Honor, is perhaps goes back to the saying of buying a pig and a poke. We had no idea what Ms. Yagnon was going to testify to other than the proffer of her testimony that was given at trial. We had brought her before the grand jury, and she had testified at one point before the grand jury. Another time she did invoke her Fifth Amendment rights. We had no idea what she would testify to at trial, however. And any decision whether to immunize a defense witness is going to raise a concern about whether, now that the witness has been immunized, that witness is going to attempt in some way to, so to speak, take the fall for the charged crimes. And so that's why the decision whether to immunize a witness, whether it's a defense witness or a government witness, is an exceedingly weighty decision that the government typically will not even attempt to make unless it has a full understanding of exactly what the testimony is going to be and confidence that that testimony is going to be truthful. Well, is that one still could have cross-examined her? You didn't give that up, did you? No, Your Honor. The government did not give that up. And you had the testimony before the grand jury. Could have cross-examined her on that? Yes, Your Honor. I think that depending on what her testimony would have been, and we don't know what it would have been exactly other than what was proffered to the district court, the government, I'm sure, would have had some basis for cross-examining her, assuming that the government concluded that she was not being truthful or that there are matters for testimony to impeach. But the other point to remember is that Mr. Yagman, by this point in the trial, had already testified at length himself, including about precisely the matters that were to be covered by Ms. Yagman. That cross-examination by government counsel took a long time. And I think that by the time that this issue with respect to Ms. Yagman arose, I think that all of these issues with respect to the Cololo check, at least, had been fully aired before the jury. So it was unnecessary to have her testimony? Your Honor, yes. We think that her testimony would have been unnecessary. And that goes back to the point I was making earlier, which is that the reason we argued that the Cololo check was evidence of bankruptcy fraud and also tax evasion and also supported a couple of the money laundering counts didn't have anything to do with Ms. Yagman's testimony about how long she held the check and why she might have held the check. The point that the government emphasized in its closing arguments was that regardless of what she would have testified, the bankruptcy petition required Mr. Yagman to disclose that check in a number of places. And in response to all of the different questions with respect to personal property, contingent interest, equitable interest, property being held for someone else that you hold or control, he consistently attempted to conceal that check. With respect to the issue of vindictive prosecution, that argument fails for several reasons. But first and foremost, it fails because the district court in this case expressly allowed a framing defense. It did that in its written orders, both before trial and after trial, explaining its exclusion of certain witnesses. And it did that in its written orders. It did not want any of the vindictive prosecution evidence brought in under the guise of framing evidence. Exactly, Your Honor. So with respect to the framing defense, the district judge was absolutely clear that the defendant was absolutely entitled to present such a defense. Did he? He didn't, Your Honor, at the end of the day, because all of the evidence that he attempted to proffer in support of that defense did not support that defense and only went to the issue of vindictive prosecution. And the district judge's careful evaluation of that testimony and exclusion of that testimony as not supporting adequately a framing defense was not an abuse of discretion. Had there been some evidence of false testimony or fabrication or undue coercion, something of that nature, would the evidence that we're calling vindictiveness evidence, that is, of the motives of the government agents to, quote, get, Mr. Yagman, would that then have had greater relevance? Your Honor, your Honor asked two questions. There was no indication in the record that agents had lied. Oh, no, no. I'm sorry. I didn't make myself clear. This is a hypothetical question. Had there been evidence that witnesses lied or that manufactured evidence was introduced or people were browbeaten into saying something that wasn't true or whatever, if there had been that kind of evidence, all of which goes to framing, would the state-of-mind evidence as to the vindictive state of mind of the agents not have been probative? The answer to that question is yes. I agree that it would have been probative, Your Honor, had the defense counsel at trial been able to articulate what the framing defense was. Instead, when the district court repeatedly pressed a trial counsel for Mr. Yagman to explain what the significance of this vindictive prosecution evidence was to the framing defense, defense counsel simply stated, well, it goes to show that witnesses were lying and biased. Well, it goes to show they did a sloppy investigation. That's what they argued. But the point is, and I think I understand this. I want to make sure I understand it. The government's position is that without some evidence of actual bad evidence, if you will, that would have been produced or presented as a result of the vindictiveness, the vindictiveness in and of itself doesn't have any relevance. That's correct, Your Honor. That is our position. And to be clear, let me back up a little bit. There is no dispute that evidence of vindictive prosecution can be used for other proper and legitimate purposes. And the district court made that clear repeatedly in its orders and in its oral rulings. And specifically, vindictive prosecution evidence could be used to, number one, impeach a witness. Number two, to attack or challenge the quality of that investigation. And that's what was involved in the Sager case. And then third, evidence of vindictive prosecution could provide a motive for witnesses to then manufacture or set up the defendant. This is the Flaming defense. By making it appear as though he had committed the crime when he did not, in fact. So there were three possible avenues that were laid out by the district court in its rulings as to how this evidence could be used. With respect to cross-examination, a number of IRS agents did testify at trial on behalf of the government, and the defendant declined to cross-examine them or attempt to impeach them using the evidence that we're discussing now. With respect to the Sager analysis, whether any of this evidence could have borne on the investigation, again, trial counsel for Mr. Yagaman came up short when he was asked to explain how it could do so. At most, the evidence at issue in the form of testimony by Mr. Pissot or the testimony of some of the early IRS agents who were involved in the investigation would have borne on the timing of the investigation, when it began, how it began. But none of those issues, neither of those issues, had any bearing on any of the evidence that was actually involved or presented at trial. And then third, with respect to the Flaming avenue ---- Kennedy, did you leave any time for your co-counsel? Yes, Your Honor. And unless the Court has any other questions with respect to either of the issues I'll be addressing, I'll turn the lecture over to Ms. Sager. Thank you. We only left her two minutes. I'll apologize to her after, Your Honor. Thank you very much for your time. May I please report? Alka Sager for the United States. Your Honor, I'd like to focus on the issue raised by the defendant appellant regarding the bankruptcy fraud and whether count two of the indictment properly charged a bankruptcy fraud. The defendant's argument is really based on this Court's decision in the Millwick case. Yes, Your Honor. The Millwick case, however, did not decide the issue that the defendant claims arose in this case. Millwick did not decide whether Section 157 must be charged as a fraudulent scheme outside the bankruptcy. Well, let's assume for the sake of discussion that Millwick does control here. Do you have the act outside bankruptcy to get you where you want to go, and if so, what is it? Yes. The government did charge a much broader scheme in this case in count two, a scheme that extended beyond just the filings in the bankruptcy context. Count two incorporated by reference the allegations in count one, which charged the income tax evasion. The time period for the income tax evasion was a longer time period than the time period for the bankruptcy fraud. And counsel characterized count one as being limited to not paying taxes. What's your response to that? Count one of the indictment charged the defendant with evading the payment of taxes they owe to the IRS by engaging in a course of conduct that frustrated the IRS's ability to collect taxes. That included concealing his assets. So it's not just the nonpayment. It's the use of fraudulent concealment to prevent the IRS from collecting payment. Is that your reading of count one? And in addition, filing petitions in bankruptcy to seek to discharge the debt. Count one alleged conduct that went beyond just mere concealment. For example, opening a bank account, a business bank account in New York, and then using that account to conduct his law firm's business prevented the IRS from being able to levy on that account to satisfy his tax obligations. There was other evidence that defendant engaged in to evade his tax obligations. For example, he, during the audit, when the revenue agent was trying to collect taxes owed to the corporation, he promised the revenue agent that he would pay his corporate tax liability from the proceeds of a pending motion for attorney's fees in a case, and thereby induced that collections agent not to file a levy on that pending motion. That had nothing to do with concealment. Those were acts that he engaged in that frustrated the IRS as a government. Count one is broad enough to include actions other than the mere nonpayment of taxes. Yes. Deceptive fraudulent type activities. And it specifically charges the filing of the bankruptcy petitions as one of the many affirmative acts that were involved. Count two, by incorporating count one and charging a much narrower scheme, actually does satisfy the Millwick requirement, if in fact Millwick requires that bankruptcy fraud scheme under Section 157 include a broader scheme. The defendant also argued in his appeal that the evidence was insufficient on the issue of materiality, that the bankruptcy fraud count, the evidence on the bankruptcy fraud count didn't evidence his materiality. And it's the government's position that the defendant has waived this argument by conceding before the trial court that materiality was not going to be an issue with respect to the bankruptcy fraud, but that in any event, the evidence in this case was overwhelming as to the fact that the defendant engaged in a scheme to defraud as to a material matter and in connection with his bankruptcy filings made numerous false statements and misrepresentations which were material to not only the trustees that were overseeing his bankruptcies, but to his creditors. And unless there are any further questions, the government would submit. Thank you. As to the first issue, the denial of due process from the dial of immunity, the government argues that it's a difference between a direct contradiction and a contradiction in inference. But Straub does not draw that distinction. In fact, if you look at Straub, what the defense wanted was immunity for a witness who would have been used to impeach a prosecution witness. That's all about using it to contradict an inference. What Straub says, as I said earlier to Judge Fogel, the test is whether or not it would distort the fact-finding. And second, I'd argue here that the denial of immunity to the defense witnesses did distort the fact-finding. Why was Mr. Vidmar used by the government here? What was the relevance of Klolochek? Mr. Vidmar testified here that Mr. Yadmin had instructed to use a cashier check rather than a wiring of assets, and also that Mr. Yadmin waited to deposit the check until after he filed for bankruptcy. This is all about inferring that there was fraud with regard to Klolochek. What Ms. Maddox would have testified to was Mr. Yadmin's mental safety in this time, and what Ms. Yadmin would have testified to is that this wasn't fraud at all. This was the routine business practices. This is key in rebutting the inference of fraud, which is the whole reason why Mr. Vidmar was testifying. Finally, the government says here, well, this is unnecessary because there are other ways the defense could show this. And this goes to the quote that I read in response to your question, Judge Fogel. When Straub, the Court said, it only has to be a brick. It doesn't have to be the wall. The testimony of both Ms. Yadmin and Ms. Maddox would have been key bricks to respond to the allegations of fraud and specifically directly respond to the inference of fraud from Mr. Vidmar's testimony. The second issue that I raise concerns bankruptcy fraud, and the argument is that Section 157 requires that there be a fraudulent scheme outside of the bankruptcy. And here the question is whether or not that exists because of the tax. Here I'd strongly encourage the Court to closely read Count 2 of the indictment, which as I said can be found on Volume 2 of Exeter Records at page 237, because I think it makes clear that the primary, if not the only thing that the government was ever alleging, was that there was concealment of assets for creditors, and that's not sufficient under Millett. But as I said in response to Judge Thompson's question, with regard to Count 1, it's very important to separate two things that are within it. One is that Mr. Yadmin did not pay taxes that were owed. That is not a fraudulent scheme within the meaning of Millett. The other thing that's alleged is that Mr. Yadmin was concealing assets from the government so as to not pay taxes. But the bankruptcy would not in any way further that fraud. The only thing that the bankruptcy could do is discharge Mr. Yadmin's tax obligations. The tax obligations are from the taxes that he didn't pay, that he owed. The tax obligations had nothing to do with the concealment. Mr. Yadmin didn't file bankruptcy to get out of tax obligations that didn't exist at that time. And so in that sense, Millett is directly relevant. Santos is also relevant, because according to the government, it's briefed, all of the money laundering counts are based on Section 1. You're saying that Mr. Yadmin had no tax liabilities? No, Your Honor, that's not what I'm saying. I'm saying that in Count 1, there are two kinds of tax liabilities. One are that he didn't pay some taxes. I'm saying that's not fraud, and Millett requires there be fraud. That's what the bankruptcy would have discharged. The other things that are alleged in Count 1 are concealment of assets for purposes of tax. The bankruptcy had nothing to do with the tax fraud in that sense. All the bankruptcy would have done is discharged the tax liability for the unpaid taxes. The bankruptcy would not have furthered any tax fraud that occurred. And for this reason, I went to the Santos case, because the money laundering, according to the government, is based on Section 152 for concealment, but Santos makes clear that concealment is not enough. The reason that materiality comes up as an issue of law is because this Court's decision in the Lovett case says that when the assets are a matter of public record, such as here the ownership of the house, that's not a basis for a material misrepresentation for bankruptcy. The third and final issue is whether or not ---- Why is that the case? Why is that true? Well, this Court in Lovett says that if the nature of the assets are a matter of public record, so that the trustee in bankruptcy can identify them, then it's not a basis for a claim of bankruptcy fraud. And our argument, our brief, with regard to materiality, is based directly on the Lovett case previously decided by this Court. And the third and final issue that's raised concerns whether due process is violated by denying evidence of defensive framing. Now, the government says a framing defense was allowed, but all of the evidence of it was excluded on the grounds that it would have gone to vindictive prosecution. Of course the judge could exclude evidence that went just to vindictive prosecution, but if the evidence goes also to framing ---- The trustee in bankruptcy is supposed to make a title search. Well, what this Court said in Lovett is that if the assets are a matter of public record ---- This Court says a lot of things. But here, Your Honor, I think you have to go to your Court's decision in Lovett that says when the assets are a matter of public record, then they don't support the material claim of fraud. And that's the argument that we make in our brief. Of course, that argument is totally distinct from the argument that 157 under Millwood requires a fraudulent scheme apart from the bankruptcy, and that's not met. The point that I wanted to make with regard to the denial of the evidence for purposes of the framing defense is that it did go directly to questions of whether or not key evidence was concealed or misrepresented. The reason why the testimony of Mullally or Isaacs is so important is they would go directly to whether or not there was framing here in terms of evidence being concealed, evidence being suppressed. And it's this that the judge erred by denying. And in this way, it's very much like Sager. Was there any proffer as to what evidence would have been brought to light had Judge Wilson ruled otherwise? Do we know what would have been introduced to trial that wasn't? Well, we know, for example, with regard to the Isaacs testimony, that there was a proffer that was that Isaacs would be questioned with regard to his bias against Yagnet, his pressure to induce Colella to testify, and also with regard to suppression and concealment of evidence. What evidence? I guess I'm just trying to get a picture of what would have been introduced to trial that wasn't. Here what the record repeatedly says is concealment and suppression of evidence. And so we know some of this, for example, some that goes earlier. For example, there was the attempt to try to show that there wasn't the anonymous tip that was the basis for the starting of the investigation. Sure, that the government tried to do this all along and there was no anonymity. But just in terms of evidence that would go to the actual charges against your client, what evidence didn't come in as a result of these exclusionary rulings? Well, the proffer was that both the Mullally and the Isaacs, that it would have been that they concealed evidence and deliberate destruction of evidence. But in terms of what that was, the record doesn't tell us. But it seems to me that this is exactly what there should have been the opportunity to present. I don't think we can ignore the context of this case. And I think what the defendant wanted to be able to do was to show that there was an intense hostility to him by law enforcement, which is the why, the who are people like Isaacs and Mullally, and then the how is the destruction and suppression of evidence. And I think that the actions that occurred early in the investigation are part also of showing the who and the why. Thank you very much. Well, I mean, if you had shown that there was intense hostility by law enforcement, then law enforcement would have been able to come in and explain why that intense hostility existed, right? I'm sorry, Judge. I didn't understand the question. I said you wanted to introduce evidence that intense hostility existed on the part of law enforcement. Yes, Your Honor, very much so. So say that would have come in. Now, could law enforcement have come in and explained why that intense hostility existed? If they wanted to do so. I mean, Mr. Yagman's contention from the beginning was that the intense hostility was based upon a career of being a civil rights lawyer. And that was the why. He wanted to show that the who were agents like Alvarado and Mullally. And the how was lying about the anonymous tip, lying to broaden the grand jury investigation, pressuring witnesses to testify falsely, suppression of evidence and concealment of evidence. And my argument is that the why should have been allowed in, just like the who and the how. And the judge denied all of this just by saying, well, it goes to vindictive prosecution. It goes to framing as well. Well, there's an overlap between the two claims. Exactly, Your Honor. The judge said this shouldn't come in because it's vindictive prosecution. But what that ignores is the same evidence that goes to vindictive prosecution also goes to framing. And to just say, well, it's vindictive prosecution can't be the basis of excluding it for framing. Well, to put it another way, Your Honor, yes, the district court said. What was the evidence of framing that your client wanted to put in? Sure. Well, the evidence of framing started with the fact that it had been testified by Pissot that it's very unlikely that it was the anonymous tip that Agent Alvarado testified to, that there was no evidence for a grand jury investigation with regard to tax fraud. The questioning of Special Agent Mullally would have been about how there'd been deliberate suppression of evidence and concealment of evidence to the investigation, that both Robert Solorio and Peter Alvarado would have been called about their having fabricated evidence during the investigation against Mr. Yagman. And Mr. Isaacs, Mr. Isaacs is a key witness because he would have been asked about how he pressured Mr. Yagman to testify falsely and also how he concealed documents. And the point of this is that when you put it together, it does show the who, the how, and the why for a framing defense. And due process was violated in the United States of Washington by excluding that evidence. All right. Thank you. Thank you. Thank you. That's it, huh? Yep. All right. We'll recess until tomorrow morning at 8 o'clock.
judges: Pregerson, Thompson, Fogel